IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISON
NO. 5:13-CT-3068-FL

KEITH V. HARNED                    )
                                   )
            Plaintiff,             )
                                   )
                                   )
        v.                         )     MEMORANDUM IN SUPPORT
                                   )     OF MOTION TO DISMISS
UNITED STATES OF AMERICA,          )     SECOND AMENDED COMPLAINT
WARDEN SARA REVELL,                )     AND FOR SUMMARY
ASSOCIATE WARDEN CAMPOS,           )     JUDGMENT
ASSOCIATE WARDEN HISCOCKS,         )
DOCTOR T. ANSARI,                  )
DOCTOR J. LINZAU,                  )
                                   )
            Defendants,            )

     The United States of America, Warden Revell, Associate Wardens

Campos and Hiscocks, and Doctor Ansari ("Federal Defendants") by and

through the United States Attorney for the Eastern District of North

Carolina, pursuant to Fed. R. Civ. P. 12(b)(6), file this memorandum

in support of Federal Defendants' Motion to Dismiss for failure to

state a claim upon which relief can be granted and pursuant to Fed.

R. Civ. P. 56, for summary judgment, and in support thereof shows

unto the Court:

                    **RELEVANT PROCEDURAL HISTORY**

     On March 26, 2013, Plaintiff Keith V. Harned ("Harned"), an

inmate at the Federal Correctional Institution ("FCI-Butner") in

1

Butner, North Carolina, filed a complaint for personal injury under the Federal Torts Claim Act ("FTCA") against the United States for injuries he suffered on August 10, 2010. (DE 1, Compl. at 14-19). Harned also filed suit for alleged inadequate medical care in violation of the Eighth Amendment under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), against Warden Revell, Associate Wardens Campos and Hiscocks, Doctors Ansari and Linzau.[1] Harned sought $3,840,000 and an order compelling the Bureau of Prisons to grant Harned the medical treatment he seeks. (DE 1, Compl. at 21-22). Federal Defendants moved to dismiss the complaint and for summary judgment. (DE 43, Fed. Defs.' Mot. to Dismiss and in the alternative for Summ. J.). Harned moved for leave to file a second amended complaint. (DE 77, Pl.'s Jan. 9, 2015, Mot. for Extension of Time; DE 78, Pl.'s Jan. 30, 2015, Mot. for Extension of Time). The Court allowed the motion and directed Harned to file the second amended complaint by February 16, 2015. (DE 79, Feb. 13, 2015, Order at 2). The Court also denied the motions to dismiss and ruled that the Court would consider the second amended complaint as Harned's final and complete complaint. (DE 79, Feb. 13, 2015, Order at 2). On February 23, 2015, Harned filed the second amended

---

[1] Defendant J. Linzau was a contract physician.

2

complaint[2] in response to the Court's order. (DE 80, Resp. to Court Order (Second Amended Compl.). Harned advances seven FTCA-related claims against the United States and a <u>Bivens</u> claim alleging Federal Defendants Revell, Campos, Hiscocks, and Ansari violated the Eighth Amendment when they allegedly knew he suffered from a serious medical condition that required corrective surgery and delayed and denied him medical treatment. (DE 80, Response (Second Amended Compl.), pp. 24-44).

Harned's first claim asserts premises liability and active negligence. (DE 80, Response (Second Amended Compl.) at ¶¶ 114-21, pp. 24-25). Harned's second claim asserts premises liability and passive negligence. (DE 80, Response (Second Amended Compl.) at ¶¶ 122-30, pp. 25-26). Harned's third claim asserts premise liability based on violation of law. (DE 80, Response (Second Amended Compl.) at ¶¶ 131-38, pp. 26-28). Harned's fourth claim asserts premise liability based on violation of law and negligence per se. (DE 80, Response (Second Amended Compl.) at ¶¶ 139-43, p. 28). Harned's fifth, sixth, and seventh claims assert active negligence (medical liability) based on the Bureau of Prisons ("BOP") rejection of an

_____

[2] On July 8, 2014, Harned filed the first amended complaint. (DE 35, Am. Compl.).

3

outside medical consultant's recommendation of a particular course of treatment, that Harned alleges resulted in a lack of appropriate medical treatment and temporary and permanent damage. (DE 80, Response (Second Amended Compl.) at ¶¶ 144-76, pp. 29-35).

Harned's also asserts that he suffered from a serious medical condition, a fractured nose, requiring corrective surgery and Warden Revell, Associate Wardens Campos and Hiscocks, and Doctors Ansari and Linzau were deliberately indifferent to his medical condition in violation of the Eight Amendment. (DE 80, Response (Second Amended Compl.) at ¶¶ 177-206, pp. 35-44).

On April 21, 2015, the Court issued an order permitting Plaintiff's second amended complaint to go forward. (DE 82, April 21, 2015, Order).

## STATEMENT OF FACTS

### A. Harned's Medical Clinical Encounters

On August 10, 2010, at 7:45 p.m., Harned reported to BOP medical personnel that he was injured while playing softball on a recreation field at the medical center (FMC-Butner). (Ex. 1, Ansari Decl. at ¶ 6, p. 3). Harned alleges the injury occurred when a softball he attempted to field hit a defective field condition and struck him in the face causing significant injury that included several

4

fractured facial bones. (DE 80, Response (Second Amended Compl.) at ¶ 37, p. 7).

Nurse Ramona Clifton was on duty. (Ex. 2, Clinical Encounter Records, p. 1).[3] Harned told Nurse Clifton that his nose was "kind of numb" and bleeding but he denied difficulty breathing. (Ex. 1 - Ansari Decl. at ¶ 6, p. 3). Nurse Clifton noted minimal swelling on Plaintiff's arrival, no deviated septum of nares[4] and that Plaintiff denied having difficulty breathing. (Ex. 1 - Ansari Decl. at ¶ 6, p. 3; Ex. 2, Clinical Encounter Records, p. 1). Dr. Linzau was an on duty physician. (Ex. 2, Clinical Encounter Records, p. 3). Dr. Linzau noted that there was no gross evidence of a fracture. (Ex. 1 - Ansari Decl. at ¶ 6, p. 3; Ex. 2, Clinical Encounter Records, p. 3). Harned was discharged back to his housing unit and advised to apply icepacks to prevent and/or decreased swelling and discomfort and advised to use over-the-counter pain medications if needed. (Ex.

[3] Dr. Ansari's refers to Harned's clinical encounter records as Attachment 1 of his declaration. Pursuant to Section L(2)(b) of the Court's Electronic Policy and Procedure Manual the undersigned designated Attachment 1 as Exhibit 2 of the Federal Defendants' motion to dismiss.

[4] According to Dr. Ansari, a deviated septum is a condition in which the nasal septum (the bone and cartilage that divides the nasal cavity in half) is significantly off center, or crooked, and that condition can make breathing difficult. (Ex. 1, Ansari Decl. ¶ 6, p. 3, fn. 1).

5

1 - Ansari Decl. at ¶ 6, p. 3; Ex. 2, Clinical Encounter Records, p. 2).

On August 13, 2010, Alnissa Carter, a physician assistant ("P.A. Carter") examined Harned. (Ex. 1 - Ansari Decl. at ¶ 7, p. 3). Harned reported that the bleeding from his nose had stopped but that his nose was still sore and he complained of bruising to his right eye. (Ex. 1 - Ansari Decl. at ¶ 7, p. 3; Ex. 2, Clinical Encounter Records, pp. 4-5). That day, P.A. Carter ordered x-rays to rule out a facial fracture. (Ex. 1 - Ansari Decl. ¶ 7, pp. 3-4; Ex. 2, Clinical Encounter Records, pp. 6-8). The radiologist noted that the x-ray revealed that Harned had non-displaced nasal bone fractures with a subtle non-displaced zygomatic mid-arch fracture. (Ex. 1 - Ansari Decl. at ¶ 7, p. 4).

Harned was transferred to Durham Regional Hospital for an evaluation. (Ex. 1 - Ansari Decl. at ¶ 7, p. 4; Ex. 2 - Clinical Encounter Records, 9-18). Harned was returned from Durham Regional Hospital the same day with a recommendation that on a later date a specialist examine Harned. (Ex. 1 - Ansari Decl. at ¶ 7, p. 4; Ex. 2 - Clinical Encounter Records, pp. 19-21).

On August 20, 2010, Dr. Ansari reviewed the record from Harned's hospital visitation and sent a consultation request to the Utilization Review Committee ("URC") seeking authorization for Dr.

6

Robert Taylor, an outside specialist, to examine Harned. (Ex. 1 - Ansari Decl. at ¶ 8, p. 4; Ex. 2 - Clinical Encounter Records, p. 21). The URC is a committee composed of BOP physicians that meet to review and approve or deny all specialty consultation requests that will be performed in-house at FCC-Butner or in the community by an outside community medical provider. (Ex. 1 - Ansari Decl. at ¶ 9, p. 4). On August 25, 2010, the URC approved the follow-up consultation. (Ex. 1 - Ansari Decl. at ¶ 8, p. 4; Ex. 2 - Clinical Encounter Records, p. 22).

On August 30, 2010, BOP personnel transported Harned to Dr. Taylor. (Ex. 1 - Ansari Decl. at ¶ 10, pp. 4-5; Ex. 2 - Clinical Encounter Records, p. 23). Dr. Taylor examined Harned. (Ex. 1 - Ansari Decl. at ¶ 10, p. 5). Dr. Ansari and a nurse saw Harned upon his return. (Ex. 1 - Ansari Decl. at ¶ 10, p. 5; Ex. 2 - Clinical Encounter Records, pp. 26-27). Harned did not complain of pain. (Ex. 1 - Ansari Decl. at ¶ 10, p. 5; Ex. 2 - Clinical Encounter Records, pp. 26-27). Harned reported that surgery was scheduled. (Ex. 1 - Ansari Decl. at ¶ 10, p. 5). The physician assistant who reviewed the records, however, noted that no surgery was scheduled. (Ex. 1 - Ansari Decl. at ¶ 10, p. 5; Ex. 2 - Clinical Encounter Records, pp. 24-25).

7

According to Dr. Taylor's consultation notes, Harned appeared to have "either a nasal chip fracture of the nasal bone on the right or possibly subluxation of the cartilage." (Ex. 2 - Clinical Encounter Records, p. 23). The notes further revealed that it was not possible to make a definitive determination without surgery. (Ex. 2 - Clinical Encounter Records, p. 23). Taylor discussed various treatment options with Harned and Harned elected not to proceed with an open exploration of the area, but he was willing to try a closed reduction (a procedure to set a broken nose without surgery) of the nasal fracture with stenting with packing as well as a septoplasty (surgery to correct any problems in the nasal septum). (Ex. 1 - Ansari Decl. at ¶ 10, p. 5, fn. 2; Ex. 2 - Clinical Encounter Records, p. 23). The plan was for the procedure to "be done sometime in the near future." (Ex. 1 - Ansari Decl. at ¶ 10, p. 5; Ex. 2 - Clinical Encounter Records, p. 23). Dr. Taylor's written report, however, was not sent to FMC-Butner until November 2010. (Ex. 1 - Ansari Decl. at ¶ 10, p. 5; Ex. 2 - Clinical Encounter Records, p. 23). Dr. Ansari reviewed the final report on November 22, 2010. (Ex. 1 - Ansari Decl. at ¶ 10, p. 5; Ex. 2 - Clinical Encounter Records, p. 23).

Dr. Ansari and BOP medical staff treated Harned on October 18-19, 2010; October 25, 2010; November 1, 2010; December 14, 2010; and

8

December 18, 2010, for medical issues related to groin pain, chronic lower back pain, and abdominal pain. (Ex. 1 - Ansari Decl. at ¶ 11, pp. 5-6; Ex. 2 - Clinical Encounter Records, pp. 28-39). A review of Harned's medical records reveals that at no time during that period did Harned complain of nasal pain or difficulty breathing. (Ex. 1 - Ansari Decl. at ¶ 11, p. 6; Ex. 2 - Clinical Encounter Records, pp. 28-39). Specifically, Dr. Ansari saw Harned on October 18-19, 2010; October 25, 2010; and November 1, 2010, and at no time did Harned complain to Dr. Ansari that Harned was experiencing pain in his nose or was having difficulty breathing. (Ex. 1 - Ansari Decl. at ¶ 12, p. 6; Ex. 2 - Clinical Encounter Records, pp. 28-34). Further, Dr. Ansari does not recall receiving any inmate requests to staff, commonly referred to as "cop-outs" and records maintained in Harned's medical file do not contain any cop-outs were sent to Defendant Ansari. (Ex. 1 - Ansari Decl. at ¶ 13, p. 6).

Dr. Ansari and BOP medical staff saw Harned on numerous times in 2011, including on February 15, 2011; April 13, 2011 (by Dr. Ansari to renew Harned's prescription for hyperlipidemia medication); May 13, 2011; July 29, 2011; August 2, 2011; August 12, 2011; August 30, 2011; September 27, 2011; October 20, 2011; and October 28, 2011. July 29, 2011; August 12, 2011; August 30, 2011; September 27, 2011; October 20, 2011; October 27, 2011; and October 28, 2011. (Ex. 1

9

- Ansari Decl. at ¶ 16, pp. 7-8). Dr. Ansari reviewed Harned's medical records and the records do not indicate Harned lodged any complaints regarding Harned's nose, pain in his face or nose, or difficulty breathing. (Ex. 1 - Ansari Decl. at ¶¶ 14, 16-17, pp. 6-8; Ex. 2 - Clinical Encounter Records, pp. 42, 48, 52-53, and 61-62).

On April 29, 2011, Dr. Ansari ordered x-rays of Harned's nasal bones as a follow-up of Harned's prior nasal bone fracture. (Ex. 1 - Ansari Decl. at ¶ 15, p. 7; Ex. 2 - Clinical Encounter Records, p. 44). On May 3, 2011, a radiologist took the x-rays. (Ex. 1 - Ansari Decl. at ¶ 15, p. 7; Ex. 2 - Clinical Encounter Records, p. 45). On May 6, 2011, Dr. Ansari reviewed the x-ray results. (Ex. 1 - Ansari Decl., ¶ 11 at 5). According to the Radiologist's notes, the findings were consistent with non-displaced fractures (a non-displaced fracture is a fracture that is considered stable, wherein the broken ends of the bones meet correctly and are aligned and the bones usually stay in place during the healing process), which were less apparent from that of the prior examination and could be related to interval healing. (Ex. 1 - Ansari Decl. at ¶ 15, p. 7; Ex. 2 - Clinical Encounter Records, p. 45).

On October 31, 2011, a physician assistant examined Harned and Harned reported that his breathing was restricted but Harned did not

report any pain. (Ex. 1 - Ansari Decl. at ¶ 16, pp. 7-8; Ex. 2 - Clinical Encounter Records, pp. 65-66).

Dr. Ansari and various BOP medical personnel saw Harned on January 5-6, 2012; January 9, 2012; January 13, 2012; January 20, 2012; January 27, 2012; February 3, 2012; February 22, 2012; May 17, 2012 (this includes a health screening performed when Harned was transferred from FMC-Butner to FCI-Butner); June 7, 2012; June 26, 2012; June 29, 2012; July 26, 2012; September 7, 2012; November 3, 2012; November 5, 2012; November 8, 2012; and December 12, 2012. (Ex. 1 - Ansari Decl. at ¶ 18, p. 8; Ex. 2 - Clinical Encounter Records, pp. 67-69, 72-107, 109-12, 114-15, 130-43). The official records demonstrate that at no point during these visitations did Harned complain about pain in his nose, face, or that Harned had difficulty breathing. (Ex. 1 - Ansari Decl. at ¶ 18, p. 8; Ex. 2 - Clinical Encounter Records, pp. 67-69, 72-107, 109-12, 114-15, 130-43).

On January 6, 2012, Harned reported that he had a broken bone in his nasal, zygomatic arch and a deviated septum but did not report that he was experiencing pain in his nose. (Ex. 1 - Ansari Decl. at ¶ 18, pp. 8-9; Ex. 2 - Clinical Encounter Records, pp. 70-71). Harned also saw Dr. Ansari on that date but did not report that he was experiencing pain in his nose or having difficulty breathing. (Ex.

11

1 - Ansari Decl. at ¶ 19, p. 9; Ex. 2 - Clinical Encounter Records, pp. 72-73).

After Harned's transfer from FMC-Butner to the FCI-Butner on May 17, 2012, Dr. Ansari had no further involvement in any aspect of Harned's medical care or treatment decisions. (Ex. 1 - Ansari Decl. at ¶ 20, p. 9).

On July 4, 2012, Harned contacted Clinical Director Duchesne regarding the status of his consultation with an ear, nose, and throat specialist. (Ex. 1 - Ansari Decl. at ¶ 21, p. 9). Harned was informed that a consultation had not yet been scheduled and that Harned should have raised that issue during his June 7, 2012, chronic care encounter. (Ex. 1 - Ansari Decl. at ¶ 21 at 9). Harned was instructed to discuss the matter with his treatment team during his next chronic care encounter. (Ex. 1 - Ansari Decl. at ¶ 21, p. 9; Ex. 2 - Clinical Encounter Records, p. 108).

On August 23, 2012, Clinical Director Duchesne initiated a consultation request for an evaluation by an otolaryngologist (an ear, nose, and throat specialist) in order to determine the medical necessity of additional procedures. (Ex. 1 - Ansari Decl. at ¶ 22, pp. 9-10; Ex. 2 - Clinical Encounter Records, p. 113). Clinical Director Duchesne noted that since the injury in 2010, no documentation reflected continued issues related to Harned's nasal

12

or facial pain.   (Ex. 1 - Ansari Decl. at ¶ 22, pp. 9-10; Ex. 2 - Clinical Encounter Records, p. 113).

On September 20, 2012, Dr. Douglas Holmes, the otolaryngologist, examined Harned.  (Ex. 1 - Ansari Decl. at ¶ 23, p. 10; Ex. 2 - Clinical Encounter Records, pp. 118).  Dr. Holmes reported that Harned had a narrowed right nasal valve with a septal nasal fracture and that it would be "a very difficult repair."  (Ex. 1 - Ansari Decl. at ¶ 23, p. 10; Ex. 2 - Clinical Encounter Records, p. 118).  Dr. Holmes noted if the URC approved of the procedure, Dr. Bill Shockley, a University of North Carolina professor would perform the procedure.  (Ex. 1 - Ansari Decl. at ¶ 23, p. 10; Ex. 2 - Clinical Encounter Records, p. 118).

On September 25, 2012, a consultation request for an evaluation was initiated. (Ex. 1 - Ansari Decl. at ¶ 23, p. 10; Ex. 2 - Clinical Encounter Records, pp. 127-28).  On October 10, 2012, the URC denied the evaluation request as medically unnecessary. (Ex. 1 - Ansari Decl. at ¶ 23, p. 10; Ex. 2 - Clinical Encounter Records, p. 129).

Dr. Ansari reviewed Harned's medical records from 2013-2015. (Ex. 1 - Ansari Decl. at ¶ 24, p. 10).  The medical records from those periods do not indicate that Harned reported difficulty breathing or nasal pain to medical staff.  (Ex. 1 - Ansari Decl. at ¶ 24, p. 10).  Harned underwent a sleep study in September 2014, to determine

13

whether Harned suffered from sleep apnea. (Ex. 1 - Ansari Decl. at ¶ 24, p. 10; Ex. 2 - Clinical Encounter Records, pp. 144-46). The sleep study recommended that Harned undergo a Continuous Positive Airway Pressure ("CPAP") study (an in-lab sleep study) and lose weight. (Ex. 1 - Ansari Decl. at ¶ 24, pp. 10-11; Ex. 2 - Clinical Encounter Records, p. 144). On February 5, 2015, the CPAP study was completed and as result of the study, Harned was issued a CPAP machine. (Ex. 1 - Ansari Decl. at ¶ 24, p. 11; Ex. 2 - Clinical Encounter Records, pp. 147-49).

**B. BOP Administrative Remedy Procedure and FTCA Administrative Claim Process**

Harned alleges that in August/early September 2011, he discussed with Associate Warden Campos the delay in treatment that he believed he was entitled to receive. (DE 80, Response (Second Amended Compl.), ¶ 75, pp. 15-16). On December 27, 2011, Harned filled out an Inmate Request to Staff form directed to the attention of Associate Warden Campos. (Ex. 3 - Inmate Request to Staff). Harned complained that his airflow was restricted due to what he alleged was the August 2010 injury and requested corrective surgery. (Ex. 3 - Inmate Request to Staff, p. 2).

Associate Warden Campos speaks with many inmates on a variety of topics in his role as an associate warden, including medical care.

14

(Ex. 4 – Campos Decl. at ¶ 3, p. 2).  Associate Warden Campos routinely tells inmates to report their concerns to their primary care providers.  (Ex. 4 – Campos Decl. at ¶¶ 3, 5, p. 2).  Although Associate Warden Campos recalls speaking to Harned regarding medical issues pertaining to Harned's face, he does not recall the specifics of the conversation and does not recall that Harned's face had any noticeable facial defects.  (Ex. 4 – Campos Decl. at ¶ 4, p. 2).

Associate Warden Campos is not a medical official and is not personally involved in providing medical care to inmates.  (Ex. 4 – Campos Decl. at ¶ 6, p. 3).  Additionally, Associate Warden Campos is not a member of the URC and does not have authority to submit or refer an inmate for any medical procedure.  (Ex. 4 – Campos Decl. at ¶ 7, p. 3).  Moreover, Associate Warden Campos was not the direct supervisor of any medical personnel.  (Ex. 4 – Campos Decl. at ¶ 7, p. 3).

On January 10, 2012, Harned submitted Standard Form 95, his administrative claim for injuries sustained in August 2010.  (Ex. 5 – Standard Form 95).

On January 22, 2012, a copy of Harned's Inmate Request to Staff was sent to Associate Warden Hiscocks.  (Ex. 3 – Inmate Request to Staff; DE 80, Response (Second Amended Compl.), ¶ 85, p. 18). Harned alleges that he also spoke to Associate Warden Hiscocks between

15

January 2012, and March 2012, regarding what he alleged was the failure to provide him with medical treatment. (DE 80, Response (Second Amended Compl.) at ¶ 85, p. 18). Although Associate Warden Hiscocks does not recall Harned or speaking with him, Associate Warden Hiscocks speaks to inmates on a variety of topics, including medical care and routinely advises them to consult with their medical providers. (Ex. 6 – Hiscocks Decl. at ¶ 4, p.2). Further, Associate Warden Hiscocks is not a medical provider nor has he sat on the URC and does not have authority to submit or refer an inmate for any medical procedure. (Ex. 6 – Hiscocks Decl. at ¶¶ 5-6, pp. 2-3).

On April 9, 2012, Harned completed and sent Warden Revell a request for administrative remedy. (Ex. 7 – Request for Administrative Remedy). Harned formally requested priority placement for corrective surgery and $3,500,000 in damages. (Ex. 7 – Request for Administrative Remedy, p. 2). On April 17, 2012, Warden Revell denied Harned's request, noting Harned's medical records showed that between October 19, 2010, and January 29, 2010, Harned did not complain of difficulty breathing related to the August 2010 injury. (Ex. 8 – Request for Administrative Remedy Response). Warden Revell also advised Harned that the administrative remedy program does not permit an inmate to receive monetary compensation and referred Harned to the Federal Torts Claims Act. (Ex. 8 – Request

16

for Administrative Remedy Response).  On April 26, Harned appealed Warden Revell's denial of his request to the Regional Director.  (Ex. 9 – Regional Administrative Remedy Appeal).

On May 3, 2012, Harned submitted an amended Standard Form 95 in reference to his FTCA claim.  (Ex. 10 – Amended Standard Form 95).

The Regional Director denied Harned's BOP administrative appeal. (Ex. 11 – Administrative Remedy Regional Appeal Response). On July 17, 2012, Harned appealed the Regional Director's denial of his request to the Central Office.  (Ex. 12 – Central Office Administrative Remedy Appeal).

On September 19, 2012, BOP denied Harned's administrative FTCA claim.  (Ex. 13 – Letter dated September 19, 2012, denying administrative claim).

On November 19, 2012, the Central Office denied Harned's appeal. (Ex. 14 – Central Office Administrative Remedy Appeal Response).

**ARGUMENT**

**I. Standard of Review**

**Fed. R. Civ. P. 12(b)(6):**

A Rule 12(b)(6) motion to dismiss test the sufficiency of a complaint.  Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999).  Pursuant to Fed. R. Civ. P. 8, a plaintiff must make a factual showing of entitlement to relief rather than a blanket assertion

17

thereto. <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 556 (2007). Although the Court must accept as true all factual allegations in a complaint, the Court is not required to accept as true the plaintiff's legal conclusions. <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009).

**Fed. R. Civ. P. 56(c):**

The Court should grant summary judgment when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact and judgment for the moving party is warranted as a matter of law. <u>Danser v. Stansberry</u>, 772 F.3d 340, 345 (4th Cir. 2014); Fed. R. Civ. P. 56.

**II.  The Court should dismiss Harned's Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted.**

**A. FTCA Claims One through Seven**

Title 28, United States Code, Section 1346(b)(1), "creates a limited waiver of the United States' sovereign immunity by authorizing damages actions for injuries caused by the tortious conduct of federal employees acting within the scope of their employment when a private person would be liable for such conduct under state law." <u>Suter v. United States</u>, 441 F.3d 306, 310 (4th Cir. 2006). Prior to filing a lawsuit, an individual must present his administrative claim to the appropriate federal agency. 28

18

U.S.C. § 2675(a). Relevant here, an administrative tort claim must be presented in writing within two years of accrual to the agency whose activities gave rise to the claim. 28 U.S.C. § 2401(b). Once an individual presents a claim, the individual cannot initiate suit until the agency denies the claim or six months have elapsed since presentment and the agency has not formally rendered a decision. 28 U.S.C. § 2675(a). After the denial of a tort claim, an individual must commence the lawsuit within six months or the tort claim is "forever barred." 28 U.S.C. § 2401(b).

Here, BOP denied Harned's administrative claim on September 19, 2012. (Ex. 13 - Letter dated September 19, 2012, denying administrative claim). Therefore, Harned was required to file his federal complaint within six months, March 18, 2013. Harned failed to initiate suit within six months of notification of the denial of his administrative claim. Harned's original complaint was processed as legal mail at FCI-Butner on March 23, 2013, as evidenced by the prison stamp mark on the envelope Harned used to mail the complaint. (DE 1-1, Envelope). Further, Harned's original complaint includes his verification that he mailed his original complaint on March 22, 2013. (DE 1, Compl., p.23). Thus, even if the Court construes pursuant to Houston v. Lack, 487 U.S. 266, 270-76 (1988) and Lewis v. Richmond City Police Dep't, 947 F.2d 733, 735-36

(4th Cir. 1991)(per curiam), that Harned's mailing date of March 22, 2013, constituted the filing date for purposes of 28 U.S.C. § 2401(b), Harned's FTCA complaint is untimely. As such, the Court should dismiss all of Harned's FTCA claims.

**B. FTCA Claims Three and Four**

Claims Three and Four of Harned's FTCA claims are also facially insufficient. Claims Three and Four allege premises liability based on a violation of federal regulations. Harned's mere allegations of a breach of duty under federal law, does not alone, state a valid state tort claim against the United States. Goldstar (Panama) S.A. v. United States, 967 F.2d 965, 969 (4th Cir. 1992).

The government's duty of care owed to federal inmates is set out in 18 U.S.C. § 4042 and is independent of an inconsistent state law. United States v. Muniz, 374 U.S. 150, 164 (1963); see also 18 U.S.C. § 4042. Pursuant to § 4042, BOP shall "provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(3). Therefore, BOP procedures, policies, or standards are irrelevant to the issue of whether the United States owed Harned a duty of care under North Carolina state law. Thus, to the extent that Harned relies on federal law or regulation to impose a duty owed

20

under North Carolina state law, Harned's Claims Three and Four fail to state a claim upon which relief may be granted.

### C. FTCA Claims Five, Six, and Seven

Harned alleges in Claim Five that Defendant United States breached its duty of care when it failed to provide appropriate medical care which "subjected [Harned] to consequences of an injurious nature which could be reasonably foreseeable, to wit: a collapsed or obstruction of the airway" that impaired his breathing. (DE 80, Resp. (Second Amended Compl.) ¶ 145, p. 29). Harned asserts that Defendant United States denial of his request for corrective surgery lead to his sleep apnea. (DE 80, Resp. (Second Amended Compl.) ¶ 145, p. 29). Harned alleges in Claim Six that Defendant United States negligently disregarded Dr. Taylor's recommended treatment plan resulting in a failure to treat the nasal fracture and collapse of the nasal wall, which lead to impaired breathing, obstructive sleep apnea and physical deformity. (DE 80, Resp. (Second Amended Compl.) ¶¶ 165-66, p. 33). Harned further alleges that a person he expects to qualify as an expert under Federal Rule of Evidence 702 reviewed available records and the medical care he received and that person would testify that he received substandard medical care. (DE 80, Resp. (Second Amended Compl.) ¶ 169, p. 33). Harned alleges in Claim 7 that: (1) Public Health Services Officers Duchesne, P.A.

21

Carter, and Nurse Clifton knew that he suffered from a serious injury, (2) that Dr. Taylor had recommended corrective surgery, and (3) Duchesene, P.A. Carter, and Nurse Clifton deliberately and intentionally failed to act and/or delayed providing him with medical services, which resulted in a worsening of his medical condition. (DE 80, Resp. (Second Amended Compl.) ¶¶ 172-73, p. 34).

Harned's alleges in Claims Five, Six, and Seven that a medical care provider (URC) refused to furnish professional services (corrective nasal surgery). As such, Claims Five, Six, and Seven are medical malpractice claims and are subject to the certification requirements in North Carolina Rule of Civil Procedure 9(j).

The URC qualifies as a health care provider. North Carolina Rule of Civil Procedure 9(j); Horsley v. Halifax Regional Medical Center, Inc., 220 N.C. App. 411, 413, 725 S.E. 2d 420, 421 (2012). Complaints alleging medical malpractice by a health care provider shall be dismissed unless they conform to the certification requirements of Rule 9(j). Id. Because Harned failed to comply with Rule 9(j), the Court should dismiss Claims Five, Six, and Seven.

The North Carolina General Assembly enacted Rule 9(j) in 1995 "in part, to protect defendants from having to defend frivolous medical malpractice actions by ensuring that before complaint for medical malpractice is filed, a competent medical professional has

22

reviewed the conduct of the defendants and concluded that the conduct did not meet the applicable standard of care." Estate of Waters v. Jarman, 144 N.C.App. 98, 100, 547 S.E. 2d 142, 144 (2001) (quotation omitted). Pursuant to Rule 9(j):

> (a)ny complaint alleging medical malpractice by a health care provider ... **shall be dismissed** unless: (1)(t)he pleading specifically asserts that the **medical care and all medical records** pertaining to the alleged negligence that are available to the plaintiff after reasonable inquiry have been reviewed by a person who is reasonably expected to qualify as an expert witness ... **and who is willing to testify** that the medical care did not comply with the applicable standard of care.

N.C. Gen. Stat. § 1A-1, Rule 9(j)(1) (2013)(emphasis added). North Carolina courts strictly enforce Rule 9(j)'s requirements and must dismiss complaints that fail to meet its requirements. Thigpen v. Ngo, 355 N.C. 198, 202, 558 S.E.2d 87, 89 (2010). A failure to comply with Rule 9(j) is also a basis for dismissal of an FTCA a complaint. Littlepaige v. United States, 528 Fed. App'x 289, 292-93 (4th Cir. 2013)(collecting district court cases)(unpublished).

Here, Claims Five and Seven fail because neither claim contains the necessary Rule 9(j) certification. Claim Six also fails. Claim Six states:

> Plaintiff alleges that the medical care and available medical records have been reviewed by a person who is

23

> reasonably expected to qualify as an expert witness under
> Rule 702 of the Rules of Evidence and who would testify
> that the medical care rendered by the Defendant did not
> comply with the applicable standard of care.

(DE 80, Resp. (Second Amended Compl.) ¶ 169, p. 33).  Harned failed

to allege that an expert had reviewed "all" records as required by

Rule 9(j).  It is impossible to discern whether Harned meant that

the expert reviewed all or some available records.  Because the

pleading requirements under Rule 9(j) must be strictly construed,

the Court should dismiss Claims Five, Six, and Seven.

## III. Dismissal of Harned's <u>Bivens</u> claims pursuant to Fed. R. Civ. P. 12(b)(6) and in the alternative summary judgment pursuant to Fed. R. Civ. P. 56 is warranted.

Harned's <u>Bivens</u> claims against Warden Revell, Associate Wardens

Campos and Hiscocks, and Dr. Ansari also fail because Harned's

complaint fails to state an Eighth Amendment violation.  Further,

summary judgment is warranted because qualified immunity shields

Warden Revell, Associate Wardens Campos and Hiscocks, and Dr. Ansari.

To establish a viable Eighth Amendment claim based on deliberate

indifference to serious medical needs, an inmate must prove two

elements: (1) that objectively the inmate's medical condition was

serious, that is "one that has been diagnosed by a physician as

mandating treatment or one that is so obvious that even a lay person

would easily recognize the necessity for a doctor's attention," and

24

(2) that subjectively the prison officials knew of and disregarded an excessive risk to an inmate's health or safety. Jackson v. Lightsey, 775 F.3d 170, 177 (4th Cir. 2014)(quoting Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008)). Deliberate indifference to a prisoner's serious medical needs may be manifested by a correctional officer "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104-05 (1976). A showing of deliberate indifference requires "proof of more than mere negligence but less than malice." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). A mere disagreement between an inmate and medical personnel as to the inmate's course of treatment does not support a claim of cruel and unusual punishment unless exceptional circumstances exist. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Importantly, each government official is liable for his own actions and the doctrine of respondeat superior does not apply. Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001)(holding that Bivens liability "is personal, based upon each defendant's own constitutional violations"); Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).

Here, Harned alleges that he informed Federal Defendants Revell, Campos, and Hiscocks of Dr. Taylor's recommendation and they

25

refused to act on the recommendation. (DE 80, Resp.(Second Amend. Compl.) ¶¶ 198, 200, pp. 42-43). This argument fails because Harned's pleadings do not establish that Warden Revell and Associate Wardens Campos and Hiscocks violated a clearly established statue or constitutional tort. Dr. Taylor, an outside physician, recommended corrective surgery. The URC exercised their medical judgment and determined that corrective surgery was not medically necessary. (Ex. 1 - Ansari Decl. at ¶ 23, p. 10; Ex. 2 - Clinical Encounter Records, p. 129). Associate Wardens Campos and Hiscocks and Warden Revell are not medical professionals, do not sit on the URC, and have no authority to compel the URC to grant Harned's request. (Ex. 4 - Campos Decl. at ¶ 7, p. 3; Ex. 6 - Hiscocks Decl. at ¶¶ 5-6, pp. 2-3; Ex. 15 - Revell Decl. at ¶¶ 5-6, p.2). Therefore, they cannot be liable under <u>Bivens</u>. <u>Ward v. Deboo</u>, Civil Action 1:11CV68, 2012 WL 2359440 *5 (N.D. W. Va. Jan. 18, 2012)(finding no liability where prison warden and chief medical officer had no role in designating which prison would house state inmate)(unpublished).[5]

Further, Harned's fails to state a claim against Associate Wardens Campos and Hiscocks, and Warden Revell because a prison administrator may rely on the judgment of prison medical

---

[5] A copy of <u>Ward</u> is attached as Exhibit 16 to the memorandum in support of motion to dismiss.

professionals and inmates disputes over the proper course of treatment do not support a <u>Bivens</u> claim. <u>Wright v. Collins</u>, 766 F.2d 841, 849 (4th Cir. 1985; <u>Dorsey v. Morgan</u>, Civil Action No. GLR-11-2723, 2012 WL 2512884 *6 (D. Maryland June 26, 2012)(finding no Eighth Amendment violation where wardens relied on medical advice to assign inmate to a prison cell bunk bed)(unpublished).[6]

Additionally, Warden Revell's denial of Harned's administrative grievance does not constitute an Eighth Amendment violation because the denial of an inmate's administrative grievance is not the type of personal involvement required to state a <u>Bivens</u> claim. <u>Batiste v. Federal Bureau of Prisons, et .al</u>, Civil Action Number 5:13-CV-13565, 2014 WL 3587919 *17 (S.D. W. Va. Jul. 21, 2014)(finding that a warden's denial of an inmate's administrative grievances is not the type of personal involvement that supports a claim of deliberate indifference under the <u>Bivens</u>).[7]

Harned's complaint fails to state a <u>Bivens</u> claim against Dr. Ansari. Harned asserts Nurse Clifton and Dr. Linzau denied him adequate medical care after he reported the injury. (DE 80, Response

_____

[6] A copy of <u>Dorsey</u> is attached as Exhibit 17 to the memorandum in support of motion to dismiss.

[7] A copy of <u>Batiste</u> is attached as Exhibit 18 to the memorandum in support of motion to dismiss.

(Second Amended Compl.), ¶ 182, p. 36). Even if the claim were accepted as true, which Federal Defendants deny, it would not impart Bivens liability to Dr. Ansari. Further, Dr. Ansari's last encounter with Harned was on May 17, 2012. (Ex. 1 - Ansari Decl. at ¶ 20, p. 9). The URC rejected Harned's request for corrective surgery in October 2012. (Ex. 1 - Ansari Decl. at ¶ 23, p. 10; Ex. 2 - Clinical Encounter Records, p. 129). Therefore, Dr. Ansari cannot be liable under Bivens where he was not Harned's primary medical provider in October 2012, when the URC declined Harned's request for corrective surgery.

For many of the same reasons stated above, qualified immunity shields Warden Revell, Associate Wardens Campos and Hiscocks, and Dr. Ansari because Harned's complaint alleges no set of facts from which a reasonable government official would know that their conduct violated a clearly established right. Qualified immunity "shields government officials from civil liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Trulock v. Freeh, 275 F.3d 391, 399 (4th Cir. 2001) (quoting Harlow v. Fitzgerald, 471 U.S. 800, 818 (1982)). Qualified immunity acts to shield law enforcement officers from civil liability for "bad guesses in gray areas" and thus ensures that the officers will only be liable

28

for violating clear bright-line rules.  <u>Braun v. Maynard</u>, 652. F.3d 557, 560 (4th Cir. 2011).  Qualified immunity "operates to ensure that before they are subject to suit, officers are on notice that their conduct is unlawful."  <u>Hope v. Pelzer</u>, U.S. 730, 731 (2002)). A right is "clearly established" where the contours of that right are sufficiently clear so that a reasonable officer would understand that what he is doing violates that right.  <u>Wilson v. Layne</u>, 526 U.S. 603, 615 (1999).  As such, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986).

Harned alleges that he provided Warden Revell and Associate Wardens Campos and Hiscocks with cop-outs notifying them of his complaints.  (DE 80, Response (Second Amended Compl.), ¶¶ 85, 92, pp. 18, 20).  These allegations, even accepted as true, would not place Warden Revell and Associate Wardens Campos and Hiscocks on notice that their conduct was unlawful because they are not medical professionals and do not have the power to order the URC to approve the relief Harned seeks.  (Ex. 4 – Campos Decl. at ¶¶ 6-7, p. 3; Ex. 6 – Hiscocks Decl. at ¶ 5-6, p. 2; Ex. 15 – Revell Decl. at ¶¶ 5-6, p. 2).  Qualified immunity also shields Dr. Ansari. Prison medical records reflect that Dr. Ansari and BOP medical staff treated Harned on numerous occasions but that Harned did not complain of nasal or

facial pain. (Ex. 2 - Clinical Encounter Records, pp. 28-39, 42, 48, 52-53, and 61-62, 67-69, 72-107, 109-12, 114-15, 130-43). Moreover, an x-ray performed on May 3, 2011, indicated that the nasal fracture was healing. (Ex. 1 - Ansari Decl. at ¶ 15, p. 7; Ex. 2 - Clinical Encounter Records, p. 45). Thus, there was no reason at the time for Dr. Ansari to believe Harned was not receiving adequate medical care.

## CONCLUSION

WHEREFORE, for the above stated reasons, Harned's amended complaint fails to state a claim upon which relief may be granted on his FTCA and Bivens claims. Additionally, qualified immunity shields Warden Revell and Associate Wardens Campos and Hiscocks, and Dr. Ansari and therefore summary judgment in their favor of is warranted on Harned's Bivens claims.

Respectfully submitted, this 4th day of May 2015.

THOMAS G. WALKER
United States Attorney

BY: /s/ Michael G. James
     MICHAEL G. JAMES
Assistant United States Attorney
Civil Division
310 New Bern Avenue
Suite 800, Federal Building
Raleigh, NC 27601-1461
Telephone: (919) 856-4049
Facsimile: (919) 856-4821
E-mail: mike.james@usdoj.gov

NY Reg. No. 2481414
Attorney for Federal Defendants

## CERTIFICATE OF SERVICE

This is to certify on this 4th day of May 2015, the undersigned

served a copy of the foregoing Memorandum in Support of Defendants'

Motion to Dismiss by ECF/CM and by placing a copy of the same in the

U.S. Mail, addressed as follows:

Plaintiff (via U.S. Mail)

Keith V. Harned
87249-020
Butner Medium I - F.C.I.
P.O. Box 1000
Butner, NC 27509
PRO SE

For Defendant J. Linzau (via ECF/CM)

J. Matthew Little
Teague, Campbell, Dennis & Gorham
4800 Six Forks Rd., Suite 300
Raleigh, NC 27609

Leslie Price Lasher
Teague, Campbell, Dennis & Gorham, LLP
P. O. Box 19207
4700 Falls of Neuse Rd., Suite 450
Raleigh, NC 27619

/s/ Michael G. James
MICHAEL G. JAMES
Assistant United States Attorney
Civil Division
310 New Bern Avenue
Suite 800, Federal Building
Raleigh, NC 27601-1461
Telephone: (919) 856-4049
Facsimile: (919) 856-4821

31

E-mail: mike.james@usdoj.gov
NY Reg. No. 2481414
Attorney for Federal Defendants